SEALED

CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
FEB 2 2 2019
JULIA C. DUDLEY, CLERK
BY: [signature]
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID 100008403589099 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. | Case No. 7:19mj28<br>**Filed Under Seal** |
|---|---|

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Nicholas Davis, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with the above-captioned Facebook accounts (hereinafter the "Subject Accounts") that are stored at premises owned, maintained, controlled, or operated by Facebook Inc., a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under Rule 41 of the Federal Rules of Criminal Procedure, 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook Inc. to disclose to the government records and other information in its possession, pertaining to the subscriber or customer operating the web sites.

2. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, United States Department of Justice, and have been so employed since December 29, 2013. Prior to this, I graduated from Lehigh University. I am a graduate of the Federal Law Enforcement Training Center and the ATF National Academy. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

2/22/2019

3. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 922 (u), Theft of Firearms from a Federal Firearms Licensee and 18 U.S.C. § 922 (j), Receipt, Possession, Selling, or Disposing of Stolen Firearms, have been committed, are being committed, and will be committed by unknown persons. There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

**PROBABLE CAUSE**

4. On Friday, May 25, 2018, at approximately 2:59 a.m., two (2) masked individuals broke into Trader Jerry's II, located at 724 W 4th Street, Salem, Virginia, located within the Western Judicial District of Virginia. This address is the business address for Trader Jerry's II, a Federal Firearms Licensee (FFL). An audible alarm was triggered and the alarm company contacted Aaron COCHRAN (manager) at approximately 3:04 a.m. Salem PD was also notified and on scene shortly thereafter. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Task Force Officer (TFO) Travis Reed and Special Agent (SA) Nicholas Davis arrived on scene at approximately 3:40 a.m.

5. Investigators ultimately determined the exterior glass door of the building had been shattered allowing entry into the building.

6. ATF Industry Operations Investigators (IOIs) conducted an inventory of Trader Jerry's II and determined that three (3) firearms had been stolen.

7. Later in the day, while reviewing surveillance camera footage from Trader Jerry's II, COCHRAN and investigators noticed an unidentified black male who, on Monday, May 21, 2018, came into the store and handled a CZ, model 805 Bren PS1 firearm. Though the CZ stolen on May 25, 2018, was not the actual firearm the unidentified black male handled, it was the same make and model. The handling of the CZ firearm by the person of interest on May 21, 2018, occurred during the normal operating hours between 10 a.m. and 12 p.m. (noon).

RJB 2/21/2019

8. ATF agents preliminarily reviewed surveillance video captured from the FFL's interior video system. The video shows that at approximately 3:00 a.m., two (2) unidentified suspects broke the glass and entered the store. The individuals are observed breaking glass displays and retrieving / stealing firearms. One individual appears to be wearing black-topped sneakers/shoes with a white sole/base. The suspects then fled on foot.

9. ATF agents caused a query of ATF's licensing database regarding Trader Jerry's II, Federal Firearms License Number: 1-54-775-01-0C-00936 located at 724 W 4th Street, Salem, Virginia, and determined that the business currently holds a Federal Firearms License (FFL) originally granted on February 19, 2002, and expiring on March 1, 2020.

10. On May 28, 2018, the Town of Vinton Police Department (VPD) responded to the report of a burglary at Virginia Gun and Knife Trader located at 1326 Washington Ave, Vinton, Virginia 24179. This address is the business address for Virginia Gun and Knife Traders, a Federal Firearms Licensee (FFL).

11. On May 28, 2018, at 1:48 a.m., a nearby resident called 911 to report he heard glass breakage in the area of Jerry's restaurant, but did not see anyone. VPD was dispatched and arrived on scene at 1:52 a.m. A preliminary investigation revealed a front window was broken on a nearby store, which was the Virginia Gun and Knife Traders store. A review of the available store videos for nearby businesses revealed that at approximately 1:38 a.m., a light colored vehicle turned off of westbound Washington Avenue onto Bush Drive. The vehicle then took a right turn on Fairmont Drive. After the vehicle circled the area, the vehicle stopped and three (3) individuals exited the vehicle. The vehicle then drives off camera. The suspects proceeded to run across Washington Avenue and at approximately 1:41 a.m. walked behind the strip mall at the opposite end from the FFL. At 1:46 a.m., the three individuals are visible on a surveillance camera at the side of the FFL. One individual appears to be on a cell phone. The video shows the individuals break a storefront window and enter the store. They took

RSB 2/22/2019

firearms from on top of display cases and broke a case to access more firearms. All individuals appear to have been wearing gloves and covering their face with a mask and/or hoodie. One individual appears to be wearing black-topped sneakers/shoes with a white sole/base, similar to the sneakers/shoes seen in the previous burglary in Salem. The individuals exited the FFL and ran across Washington Avenue to Bush Drive where the escape vehicle (a few moments before) had come back into view of the surveillance camera and repositioned. The vehicle drove eastbound on Washington Avenue and out of sight from the camera. While three individuals can be seen working in concert in the second burglary in Vinton, the individuals are of the same approximate height and build as the two individuals seen in the Salem burglary. It should be noted that the City of Salem and the Town of Vinton are located generally on opposite sides of the City of Roanoke, and that each of the two burglaries appear to share a common *modus operandi* involving a plan to "smash-and-grab" firearms. In both instances, the perpetrators fled the scene of the crime approximately thirty (30) seconds after smashing the front window.

12. ATF Industry Operations Investigators (IOIs) conducted an inventory of Virginia Gun and Knife Traders and determined that eleven (11) firearms had been stolen. One additional firearm was located on Washington Avenue, apparently after being dropped by one of the fleeing perpetrators.

13. ATF agents caused a query of ATF's licensing database regarding Virginia Gun and Knife Traders LLC, Federal Firearms License Number: 1-54-161-01-9A-17008, located at 1326 East Washington Avenue, Vinton, Virginia and determined that the business currently holds a Federal Firearms License (FFL) originally granted on December 17, 2015, and expiring on January 1, 2019.

14. On 11/04/2018, ATF Task Force Officer (TFO) Neil Gardner and SA Nicholas Davis interviewed Dre'Qwan CUNNINGHAM at the Roanoke City Jail in reference to firearms purchased from him utilizing an ATF undercover agent. CUNNINGHAM provided a post-Miranda confession to selling at least one (1) stolen firearm (determined by agents to have been stolen from Virginia Gun and Knife Traders FFL). CUNNINGHAM stated he initially received this firearm from "Quo" (through additional

investigative channels, he has been identified by law enforcement to be Quoterris MARTIN). CUNNINGHAM stated he met Quo through an individual named Markwon MARTIN. CUNNINGHAM stated that over the summer he received a Facebook message from "Quo" early in the morning of 5/25/18 that stated, "Bag secured." CUNNINGHAM called "Quo", via Facebook, and "Quo" told him they had robbed a gun store and had guns they needed to sell. According to CUNNINGHAM, later that day, "Quo" and Markwon MARTIN visited him and showed him two (2) rifles that they had stolen.

15. CUNNINGHAM further stated that he took one (1) of these firearms to sell.

16. CUNNINGHAM was released on bond from the Roanoke City Jail on 11/04/2018.

17. On 11/06/2018, TFO Gardner and SA Davis made contact with CUNNINGHAM and invited him to come to the ATF-Roanoke Field Office for a lengthier debrief. CUNNINGHAM agreed and was picked up by investigators. CUNNINGHAM provided further details on the FFL burglaries.

18. CUNNINGHAM positively identified pictures of Markwon MARTIN and "Quo" (Quoterris MARTIN). CUNNINGHAM stated a third individual assisted in the burglary, Talib LNU (Last Name Unknown). CUNNINGHAM positively identified a picture of Talib JOHNSON, as the individual he knows as "Talib." CUNNINGHAM stated he recalled Quoterris MARTIN and Markwon MARTIN breaking into a second gun store only a few days after breaking into the first. This is consistent with the timing of the burglaries of the Trader Jerry's II FFL and the Vinton Gun and Knife Trader FFL.

19. CUNNINGHAM allowed investigators to take pictures of his Facebook Messenger conversation with Quoterris MARTIN (FB username: "Jackboy QUO") from 05/25/2018. It should be noted that 05/25/2018 is the date that Trader Jerry's II FFL was burglarized.

20. Below are the pictures of that conversation:

RB 2/22/2019



a.

CUNNINGHAM advised investigators that "bag secured" was in reference to the stolen firearms now being in Quinterris MARTIN's possession. CUNNINGHAM advised investigators that "chopstick" is a street term for "firearm."



Jackboy
Send me a pic bro
Everything good just need a clip an bullets
And what type is it ?
M109
Jackboy missed a call from you.
May 25 at 8:47 AM
CALL AGAIN
Aa

b.

Jackboy
CALL AGAIN
My people's want it rn
Both of em dude
You called Jackboy.
1 min 12 secs, May 25 at 8:47 AM
CALL AGAIN
Y'all cumin or naw
Shit im waitin on him if he take too long ima buck ona cab no cap
Lls tellem dude will buy both 600
Aa

c.

Your affiant knows "no cap" to mean/infer that one is "not lying."

d.

Your affiant knows "jawn" to be replaceable with "thing" or any direct object. Your affiant understands "I'm finna dip" to mean one is going to leave.

21. CUNNINGHAM advised investigators that he had had Facebook Messenger conversations with Markwon MARTIN, though when he attempted to pull up these conversations on his Facebook account, they were not readily present.

22. CUNNINGHAM told investigators that shortly prior to the first burglary on May 25, 2018, he was present in a vehicle with Markwon MARTIN and Quoterris MARTIN. During this interaction, Markwon MARTIN and Quoterris MARTIN were talking about the possibility of robbing a gun store.

23. In reference to picture "b." above, your affiant knows that white tag on the firearm to be a label from Trader Jerry's II FFL. Your affiant knows this because, in viewing

RSB 2/22/2019

CUNNINGHAM's phone, he was able to zoom in on the picture and visibly see Trader Jerry's II name on the label. Viewing the messages and picture on CUNNINGHAM's phone afforded a higher picture quality than the pictures taken of CUNNINGHAM's phone screen.

24. Facebook Account IDs of the subjects are as follows:

a. Dre'qwan CUNNINGHAM: 100001213592350 and 100025638307727

b. Markwon MARTIN: 100008403589099, 100001551941996

c. Quoterris MARTIN: 100001434943262; 100021909052806

25. Your affiant used the website https://findmyfbid.com/ to ascertain the aforementioned individuals' Facebook Account IDs. After obtaining the numeric account ID from https://findmyfbid.com/, your affiant corroborated this information by using the numeric account ID and searching it using Facebook.com to ensure correct account specifics.

26. Based on my training, knowledge and experience, I have come to understand that individuals will often use social media, to include Facebook, to plan, prepare, and further their criminal activity to include the acquisition, possession, sale, and/or distribution of stolen firearms. I have also come to understand that individuals will also use the private message feature of Facebook to communicate privately with others in furtherance of illegal activity to include the acquisition, possession, sale, and/or distribution of stolen firearms.

27. Based upon the facts set forth above and other information and/or intelligence known to law enforcement involved in this investigation, your affiant believes there is sufficient probable cause to believe the sought-after Facebook Accounts contain information related to the plan to burglarize, theft, and disbursement of firearms from Federal Firearms Licensees (FFLs).

RSB 2/22/2019

**FACEBOOK**

28. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

29. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

30. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

31. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.

RSB 2/22/2019

Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

32. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

33. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when he or she uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

34. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These

RSB 2/22/2019

chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

35. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

36. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

37. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

38. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

39. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

40. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

41.  Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

42.  In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

43.  Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

44.  Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

45.  Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing

inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

46. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

47. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

**CONCLUSION**

48. Based on the foregoing, I request that the Court issue the proposed search warrant. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

RSB 2/22/2019

**REQUEST FOR SEALING**

49. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application, affidavit, and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations and not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, e.g., by posting them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

Nicholas Davis
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed and sworn to before me on February 22, 2019

Robert S. Ballou
UNITED STATES MAGISTRATE JUDGE